Good morning. Good morning, your honors. May it please the court, I'm here on behalf of Paul Bey. Excuse me, you should wait until your brother has been seated. Alright. I know you don't have eyes in the back of your head, but please observe that courtesy. Okay, now you may proceed. Thank you. May it please the court, I'm here on behalf of Paul Bey. At the outset, would you mind pulling the mic closer? Thank you. At the outset, I would be asking for two to three minutes of rebuttal time, if I may. Yes, you may have it. Thank you, your honor. Your honor, your honors, I'm here today to address preliminarily the case that was argued before the district judge. In those set of facts, Mr. Bey was staying over his girlfriend's house, Clarissa Summons, from time to time. There was an active restraining order, in effect, against Mr. Bey that was taken out by Ms. Summons. But I think the court can infer the evidence would be that it was shown that Ms. Summons had that the court could draw from the evidence of the motion to suppress hearing was that based upon the relative frequency of Mr. Bey's stay at Ms. Summons' house, that he likely believed that there was no restraining order in effect. On July 29th, 2013, the Everett Police, acting on a tip from the Lynn Police, learned that Mr. Bey might be at Ms. Summons' house in Everett. There was no evidence to suggest that either the Lynn Police nor the Everett Police knew that Mr. Bey was living or residing at that location. They arrived at Ms. Summons' home. There were multiple police officers who came to her door. Ms. Summons had a young child who was at the home and feeling coerced and pressured by the large warrant. She felt compelled by their presence, in effect, involuntarily assented to their entry to the home. They came in and immediately found Mr. Bey in one of the bedrooms and a black backpack near Mr. Bey. They didn't know whose backpack it was. When you say she involuntarily consented, I thought there was testimony that she more or less signaled them to come in. That was testimony from Detective Stoltbaum. That was not testimony from... But in the procedural posture of this, don't we have to give credence to the resolution of that fact dispute? I don't necessarily agree with that. I think it becomes a credibility issue and the court can determine whether or not it was credible to believe, given the totality of Ms. Summons' testimony at the motion to suppress hearing, whether or not she actually pointed or motioned to allow, in a sense, voluntarily consenting. I think that that's a... You're saying there's something about these circumstances that makes that so palpably and inherently incredible that as an appellate panel we would overrule the credibility determination of the trial? Yes. I think that the presence of multiple police officers at someone's door where they are housing a young child cannot be overstated under the circumstances. I think that Ms. Summons' will, in a sense, was overborne by the presence of so many police officers who were clearly stating their goal to make entry into her home. Hadn't she previously gone to court and asked the court and the law enforcement community to protect her from him and keep him away? She had. Why is it implausible that on this other occasion when she opened the door and saw officers standing there, he's in the apartment, that she may well have seized the chance to get them in? Her testimony at the motion to suppress hearing was... But I'm not talking about her testimony. I'm talking about just given the prior efforts she's taken, why is it incredible that she's changing her mind back and forth, back and forth about this guy? I just want to be clear so I can respond correctly. You're asking me whether or not it was reasonable for the police to have a belief that she was cooperating with them. It's reasonable that it happened, that the police officer's testimony regarding her signaling them in was credible. Again, I think you have to look at the totality of the testimony and the evidence that was presented. I would suggest under the circumstances that it wasn't reasonable for the police, given that she was cooperating, or she was having Mr. Bay stay at her apartment multiple times a week and that was her testimony, that she would have a radical change of mind, radical change of heart when she saw the police. She had every ability one can presume or infer that if Mr. Bay was an unwanted guest, given that she had the power of this restraining order, that she could have contacted the police on any singular occasion. Her testimony is that she didn't consent or that she consented but it was an involuntary signal? That she consented but it was an involuntary signal. That she felt so pressured by the presence of numerous, that there were I think at least four or five police officers, multiple cruisers that she could see on the street when she opened her door, that she didn't feel that she had any possibility to say no. So I would suggest to the court that just ab initio, the consent was involuntary because of her will being overborne by the large presence of police. I would also say to the court that That's just a pretty, I mean if we adopted that approach it's a pretty significant seemingly per se rule that when multiple police officers come to the home it's impossible to consent to their entry. I think, I don't think that one, the court has to adopt a per se rule and I think that that would But how, on this record, how could we be doing anything other? All we have is, as I now understand, undisputed testimony by the officer that she signaled them to come in and that there were a number of officers at the door and she had a child. And you'd want us to say in that situation we just have to credit after the fact the testimony of the person who owns the house saying the only reason I consented is because I was coerced? I think, again, and I just want to try to be clear, I'm not suggesting the court should adopt a per se rule. I think that that would be, I think each case has to be looked upon on the facts of that case and I think that you'd have to look at the totality of the evidence in the case of the testimony of the witnesses to see what had followed to make a determination as to whether or not it was credible that she could have been feeling that pressure. And I would suggest that what happened next, in fact, lends credence to the argument that in this specific circumstance she was not only pressured to consent to entry, but also pressured to consent to the search of the backpack. I think that the district judge got it right when she opined that both Mr. Bay and Ms. Summons had a privacy interest in the backpack and the testimony by Ms. Summons at that time was that the police had essentially already searched the backpack and were now looking for consent to essentially give credence. How do you say they searched the backpack? I believe that that They did not open it. They moved it because it might have a weapon that he could reach at the time they apprehended him. And then they went to get the consent to search form and they go through that with her and it includes the backpack. And only at that point do they search the backpack. That was Detective Stahlbaum's testimony, but I think Ms. Summons had testified, if I recall correctly, that it appeared that the police had already been opening containers and looking at things without the evidence, without a search warrant, without a search warrant present. That it appeared that they had already taken this conduct and would essentially be getting a search warrant. But she did not herself testify that the backpack, she had observed the backpack, it had already been opened and searched. That's correct. And I just, I want to, that the appearance of, she couldn't, she could see into certain rooms, she could see, she couldn't see what was going on exactly, but she could see that it appeared that there had been a significant disturbance in her of what law enforcement would do to merely freeze and do an initial search of the apartment to make sure no other persons were present. Ms., I think it's, I think that the district judge, however, got it wrong when she denied that she found that Ms. Summons gave consent without coercion or pressure to the opening of the backpack. Clearly both Ms. Summons and Mr. Bay had a privacy interest in the question was whether or not the police officers' conversations with her essentially saying, you know, I recall DCF, when she had her small child there, was sufficiently coercive. There's certainly case law that suggests that. And I think I would also point out to the court that one can infer that given law officers are mandated court reporters to DCF, that was information that they were themselves aware of. That was information they volunteered not because it was true, but only because they, knowing that they had the power to do that and could and should do that, made sure she was aware that this was something they could or would do. And I think the court can certainly draw an inference based upon those who operated with law enforcement, even five days later, was because the stigma and the fear of having DCF become involved with her family and the possibility of having her child removed was significant and overpowering, such that she had no choice but to agree. And I would suggest that there's, given that... You've put the officers in an impossible situation. On your rule, if they mention they're gathering information, that per se has overpowered her. But they are required by state law to gather such information. They were... Haven't you set up this Hobson's choice? I don't think so, because when you ask me if they're gathering information, gathering information is merely gathering factual content. The Everett Police Department doesn't work for DCF. Their sole obligation, should they choose to do so because of factual content or information that they acquire, is to make a report to DCF. They have no obligation to do it unless they feel that the circumstances arise. But those circumstances would only be as a result of information that they gather. In other words, the comment about DCF was merely done, just raising the information about DCF, was done solely to pressure Ms. Summons. There was no reason for... It would have been okay to get the name, the birth date, all of that. The problem was mentioning DCF. Is that your argument? In essence, that's my argument. The reason they were gathering this information was not from Ms. Summons' perspective, just to gather information, because she was a resident of the apartment and they needed to know who was living there. But specifically, because they were gathering that information and concurrently mentioning DCF, Ms. Summons could conclude nothing but that her cooperation and her consent was possibly going to so-called keep the DCF dogs off. And that was a very, very powerful incentive to cause her to consent involuntarily. And I think that one cannot, again, overstate the fear of a parent in the likelihood of a child being removed from their presence. And certainly under the circumstances where she had already, in essence, been feeling pressure to let the police in, now acknowledging that she had some ownership of the backpack, I think, in totality, that pressure was real and live. You've reserved some time. We assume during that time you will get to the waiver of appeal on your sentencing argument. Thank you. Your Honors, may it please the Court, Randall Cromwell on behalf of the Government. I think in this case it really comes down to the fact that I have been tried in the District Court in accepting the facts as found, which I think have not been shown to be clearly erroneous. The legal conclusions essentially flow from the facts as found. With respect to the entry, it has already been discussed that essentially what is being argued for is a per se rule that just by the virtue of the fact that there were several officers present and several officers were involuntary. To clarify one point, the woman, Clarissa Summons, did acknowledge that she had waived them in. So she acknowledged herself in her testimony that she had consented, as Your Honor, Judge Barrett has brought out, that she did in fact consent. It was only that she felt that she had to was her argument. But what she admitted in a direct question from the District Court was she did so that they had said nothing to threaten her directly or did anything that made her, no words they said conveyed the threat, but it was simply that they were police officers at her door that she viewed as threatening. And obviously if that were the rule, there would be very few cases in which you could have consent if the police officer's presence itself was coercive. With respect to the backpack, there was a little more said about the specific facts there. And again, I think it's important to sort of clarify the District Court did find that the backpack was not disturbed in any way during the time between when Officer Stalbaum said that he was going to get a consent form and when he came back in and gave it to her, it was never opened or gone through. She did say that there was some witness testimony that while she was outside the room and she came back in, it looked like there had been a disturbance that had been, that was projected by the District Court. And I, again, don't think you can find that to be clearly erroneous on this record. And so then the question is, again, simply whether the circumstances of her consenting to have it searched were rendered, made it involuntary because of this reference to DCF. And on that, I think I really want to disagree with the statement that somehow the mere reference to the fact that the officers were mandated reporters, which I believe was conceded below and the District Court found that officers had to report if they saw information bearing on their custody while they were in the house. The suggestion seems to be that it would have been okay for them to collect the information, but they couldn't say what they were collecting it for. That seems to turn it on its head, the idea that somehow they would have been doing the right thing to have hidden from her why they were asking the questions. I mean, obviously, that's their, at that moment, that is an important question for them. They believe that reasonably there's a violent person who was just in the house, a person who has had a gun, has been in the house. They're collecting information. And I don't know what value to be served by saying that they're supposed to hide from the person they're asking the purpose of their inquiry. And that said, I guess the practical concern is even if that's true, there is a risk that you could then use it strategically, which is not the purpose of having them be mandated reporters. And so you time the reference to DCF and when you're going to do it right around the time that you need her consent to search to something. That doesn't seem like it's a practice that you'd want the legal system to sanction. Right. And that's, I mean, if there was some indication on this record that that's what happened, one could raise the question that even a valid piece of information or information that should be given was just given in a way that involved manipulation. But the district court rejected that, specifically finding that because it was a different officer that raised this question, in fact, quite a while, some time separated them, and there was no attempt to link the two. Essentially, Officer Stahlbaum leaves, goes to get the form, takes at least 15 or 20 minutes for him to come back with it. During that time, there's some collection of information, a mention, and there's no suggestion that there was anything more than a mention, that the DCF could be contacted. No attempt to link it to the consent that was to follow. Some time later, Officer Stahlbaum comes down, and again, the testimony which was adopted by the district court is he sat down with her and went through, that she didn't have to consent, it was voluntary, went through all the information with her, and then she agreed to sign it. I think on these facts, it would be hard to say. You'd be importing information that doesn't exist on the record to say that there was any attempt at manipulation or any effect because the district court found that under these circumstances, the difference in time, different person giving the information, it just wouldn't have been perceived as the kind of overpowering threat that could invalidate the consent. I don't know if there's any other questions. I know there's a number of different theories here, but the consent is one that's been argued, and that's one that I focus on as well, if The government is arguing that there was a guilty plea here. There was a waiver of appeal. He was sentenced, in fact, to 60 months, not 70 months, which was recommended, and therefore we should not get into the Johnson issues on sentencing. Her argument is Johnson has some relationship to due process, and once there is a constitutional allusion made as to sentencing, that that is sufficient to invalidate the waiver of appeal. Would you like to talk about that? Yes, Your Honor. I don't think there's any, what we pointed out is this is very much on all fours in terms of its actual impact with the Soterian case, where they found that again, it was a two-level increase. That was an abuse of position of trust increase that was improperly applied. It was clearly improperly applied. It applied under circumstances in which the guidelines specifically say it should not be, but it was applied with the acquiescence of both parties, and this Court did not find, have any trouble finding that that was within the scope of an appeal waiver, not a miscarriage of justice, given its sort of scope and impact on the proceeding, a two-level increase is exactly what the impact of the Johnson error was here, and I guess the suggestion would be that somehow an error of the same magnitude having the same impact acquiesced to in similar ways somehow becomes different simply because it has a constitutional basis sort of deep in its origins, and I don't see any case supporting that suggestion. The criterion for deciding whether there's miscarriage of justice, you know, one of the criterion is the gravity of the error, but that typically goes to its impact on the defendant, not its sort of more metaphysical gravity. In this circumstance, it had a small impact. There are cases where, an ACCA case or something, where it can have a significant impact. In this case, the way that the residual clause came into play was simply to make a two-level increase, which it's now argued would not apply in the wake of Johnson II because resisting arrest is not... Johnson, of course, has caused dislocations in a lot of areas of sentencing law, but do you know whether any of the other circuits have dealt directly with this question in Johnson context? To be honest, I don't, and I would be happy to look and see if anything. I did not find anything in the comparable circumstances, that is to say, where it had a relatively minor impact. It's one thing, again, an ACCA would present a very different circumstance and the government, in fact, might be saying that it did have an impact on the sentence that was significant enough to take cognizance of in this circumstance, but this is, again, a very minor type of impact on the sentence, so I think it falls within what this court has described as a garden variety error in its impact in this case. Okay. Thank you, Your Honor. Did you just... When you say the impact is minor, in what sense? The impact is minor in terms of its impact on the calculated guidelines. So the calculated guidelines here, because of the way it came in, it did not... It was not a career offender case is what I'm trying to distinguish from. In other circumstances in which adding it, this particular... Treating it as a predicate would have a dramatic effect on the guidelines. All it did is it was a particular guidelines provision that allows for... If a crime of violence will increase the sentence, the base offense level by two levels. So essentially that was the only difference. And what's the effect then on the range as a consequence of that? We have it in the brief, and I can't say that I know exactly, but I did point out in the brief is that the sentence recommended and the sentence given were both below either range. In other words, we had agreed to a range, the 70 months, which was lower than either range, whichever way you calculated it. I think it's also worth noting, I think the PSR range was actually higher because there was an enhancement that was... Or criminal history that was higher than was contemplated. So in fact, there was even more variance between what the government asked for and what the court gave than what the ultimate GSR was calculated as. So one of the points we argue, it's not clear at all that the GSR played a significant role given the focus seemed to be on the government's agreed upon recommendation and not the GSR at all. And didn't the district court say something to the effect that there was no way it would go beyond, below 60 months because he had an armed weapon with him? Right. And in explaining the basis for going as far as it did and no further than it did, the court emphasized the presence of a firearm in a house with a young child, and it felt that in those circumstances it couldn't go any further. If there aren't any further questions, we'll rely on the brief for the rest of the issues and ask you to affirm. Thank you. Thank you. Council? Thank you, Your Honors. Just to briefly address a point that the government made... Speak up. Just to briefly address a point the government made regarding the fact that there were two different police officers, one of whom actually remarked upon the DCF intertwining with the information gathering and the fact that it was a different detective, I would suggest to the court that that should have no effect upon the court's decision. Clearly, the police officers were acting as a team. There would be no question that any civilian would reasonably infer that there was a strategic effect to the fact that there were multiple officers there and that the officers were all privy to the same information. The fact that there were two different officers didn't necessarily negate the fact that there was lack of voluntariness. Just for clarification, since the court asked the question, the implications of the difference in the sentencing guideline, the GSR, under the original base of the total offense level would have been 100 to 125 months as opposed to 84 to 105 months. So that was the difference. But I'd suggest to the court that even under a miscarriage of justice standard that the implications for Mr. Bay were real in terms of the difference. Understand that the court was looking at those different, a GSR base offense level, and although there was a plea agreement of 70 months, the court still had the available information of the GSR to inform her about what would be the appropriate sentence. Yes, the fact that he had a firearm at the location was a factor in her decision, but even a reduction of sentence for a period of months would have had a great impact upon Mr. Bay's life. It was clear during the argument at sentencing that Mr. Bay had four children that any additional time would have a significant impact upon him. Thank you for your time, Your Honor. Thank you, counsel.